# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# JACKSON DIVISION

BRENDA HORTON                                                                    PLAINTIFF

vs.                                                            Civil Action No. 3:09-cv-66 HTW-LRA

ENTERGY SERVICES, INC., and
ENTERGY MISSISSIPPI, INC.                                                      DEFENDANTS

## MEMORANDUM OPINION AND ORDER

Defendant Entergy Services, Inc., and Entergy Mississippi, Inc., have moved for summary judgment [docket no. 50] pursuant to Rule 56 of the Federal Rules of Civil Procedure,[1] claiming that no genuine issue of fact exists in this case and that they are entitled to judgment as a matter of law. Plaintiff Brenda Horton, however, opposes the motion, contending that factual issues are in dispute that require a jury's determination and which preclude summary judgment. Defendants also have filed a motion in limine

---

[1] Rule 56 of the Federal Rules of Civil Procedure provides in pertinent part:

(a) Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense - or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

[docket no. 64]. This court hereby grants the defendants' motion for summary judgment and finds the motion in limine moot for the reasons which follow.

## I. Facts

### A. Brenda Horton

Brenda Horton, an African American female, originally hails from Canton, Madison County, Mississippi.[2] She graduated from Velma Jackson High School in Madison County, Mississippi, and then attended Jackson State University, Jackson, Mississippi, where she earned a degree in Political Science in 1983. She worked in Mississippi until 1986 when she moved to Chicago, Illinois, where she married Lavelle Horton and had two children.

In 1987, she began working at Ameritech in the Human Resources Department, Chicago, Illinois, receiving several promotions over her seventeen (17) years there. Horton eventually decided to return to Mississippi. She also decided to terminate her marriage to Lavelle Horton and marry Gregory Robinson.

In June 2004, Horton returned to Mississippi, obtained a position as Human Resources Manager at Entergy Services, Inc. ("ESI"), and in December 2004 married Robinson. Horton continued her education while working by attending classes at night. She earned in June 2008, a Master's degree in management from Belhaven University, Jackson, Mississippi.

---

[2]The facts describing Horton's background are as stated in Horton's Affidavit [docket no. 54-1] and Deposition [docket no. 50-13].

**B. Investigation of Steve Young's Discrimination Complaints**

Steve Young, a lineman with ESI, aggrieved over incidents he described as racially discriminatory, complained to ESI management.[3] According to Young, ESI management did not take him seriously and had done nothing in response to his complaints. Young, in August of 2005, then contacted Horton, a Human Resources Manager at ESI, and voiced those same complaints to her. Young complained of a hostile work environment where his white co-workers had called Young and other African Americans monkeys, niggers, jigaboos and the like. Horton launched her own investigation of Young's claims of race discrimination in the fall of 2005.

Horton interviewed Young, the white co-workers who allegedly made racist comments to Young, Young's African American co-workers, and Young's managers. The responses of the groups were not consistent.

Young's managers denied that Young had been the target of discrimination, describing him as overly sensitive to racial topics and a notorious complainer regarding race relations. The white co-workers about whom Young complained, on the other hand, admitted to Horton that when they went out on the line, they did not necessarily use professionally appropriate language, especially when discussions became heated. They denied, however, employing the racist language Young alleged. Young's African American co-workers, though, affirmed that the white workers had made the vitriolic comments Young alleged.

---

[3] The facts describing Steve Young's discrimination complaint and Horton's investigation thereof are as stated in Horton's Affidavit [docket no. 54-1], Horton's Deposition [docket no. 50-13] and Young's Deposition [docket no. 54-4].

Horton completed her investigation by the end of 2005 and concluded, based on the supporting testimony of Young's co-workers, that the white workers had used racist language. Horton further concluded that Young had been the victim of racial discrimination.

Horton discussed her findings with Chris Cooper, the area manager for the distributions operations unit where Young worked. Cooper interviewed Young after Horton did. Cooper told Horton he did not think Horton's findings were accurate or that Young had been the victim of discrimination. Cooper wanted Horton to alter her findings. She refused.

Horton also presented her findings to Richard Ferguson, the Human Resources Director; Anne Breaux, Entergy's corporate attorney; Michael Vaugh, Director of Distribution Operations; and Carolyn Shanks, ESI President. Michael Vaugh commented to Horton that Young had a history of making discrimination complaints.

Unmoved from her determination that Young had been the victim of racial discrimination, Horton suggested that the company should find a way to resolve the dispute. At that point, says Horton, all Young wanted was an apology.

Horton's advice was rejected; instead, the company undertook a new investigation. Anne Breaux, in particular, criticized Horton's investigation and findings, calling the findings inaccurate and the investigation wanting.

ESI named ESI employees Katherine Lane and Ryan Hubbs to investigate Young's complaints. Horton was not selected for this second investigation.

Once Lane and Hubbs completed their investigation, they advised Young of their findings. Young was dissatisfied. Thereafter, he filed a charge with the Equal

4

Employment Opportunity Commission (EEOC). He filed a lawsuit once he received a right-to-sue letter from the EEOC.

**C. Investigations of Brenda Horton**

    **1. First Investigation**

While Lane and Hubbs were conducting a second investigation of Young's complaints, ESI assigned Hubbs to conduct an investigation of Horton.[4] Apparently, ESI sought an understanding of how Horton had conducted her investigation of Young's complaints and how Horton had reached a conclusion contrary to others involved in the Young matter. Horton was unaware that the investigation was taking place as it occurred. She learned of the second investigation at Lane's deposition of June 24, 2010. Horton's affidavit [docket no. 54-1]. Horton points to the following excerpt of Lane's deposition:

> A: I notified [Horton] that we had closed out the report and that there was a second report on how she conducted the investigation. . .
>
> Q. So the investigation of Miss Horton was specifically about how she conducted the Steve Young investigation. Is that what I'm hearing?
>
> A. That was what I was informed of. . .
>
> . . . .
>
> Ryan said he would like to look further into how [Horton] conducted the investigation while we were still en route with the other investigation. "En route," in process, is what I meant.

---

[4] The facts describing ESI's investigations and ultimate termination of Horton are as stated in Horton's Affidavit [docket no. 54-1], Horton's Deposition [docket no. 50-13], Young's Deposition [docket no. 54-4], Lane's Deposition [docket no. 54-3], Allan Smith's Declaration [docket no. 50-1]; and Susan Furr's Declaration [docket no. 50-9].

> Q. So there were two concurrent investigations going on, one of [Young] and one of [Horton]?
>
> A. Yes.
>
> Q. And who conducted the investigation of [Horton]?
>
> A. Ryan Hubbs.

Lane Deposition, pp.32-33 [docket no. 54-3]. Horton says she was never interviewed, counseled, reprimanded, advised on how to conduct future investigations or provided with a report on the findings of the investigation.

In mid 2007, Barbara Wallace, who represented ESI in Young's lawsuit, *Young v. Entergy Mississippi, Inc.*, Civil Action No. 3:06-cv-328 HTW-LRA, interviewed Horton, among others, in preparation for trial. When Wallace asked Horton whether Horton had an opinion that Young had been the victim of racial discrimination, Horton answered yes.

The Young case was settled prior to trial. The parties filed an Agreed Stipulation of Dismissal on June 22, 2007. Young left employment with ESI in May or June of 2007.

## 2. Second Investigation

ESI investigated Horton a second time in 2008. This investigation had nothing to do with the Young case. The catalyst for this investigation was an African American female by the name of Sandra Anderson.

Sandra Anderson, a Program Analyst, was employed by the Veterans Affairs Hospital ("VA Hospital"), Jackson, Mississippi. She and Horton knew each other, but were not friends. Years back, Anderson had dated Horton's husband, Greg Robinson.

In 2008, the trio of Horton, her husband, and Anderson revealed a possible love triangle. Anderson, who acknowledges that she had a romantic entanglement with Horton's husband in the 1980's, denies any romantic interest in Horton's husband in 2008. Horton challenges Anderson's accusations that she (Horton) had telephonically harassed Anderson over Horton's suspicions that Anderson had designs on Horton's husband.

The backdrop of this dispute occurred when Horton's husband, Greg Robinson, was a patient at Central Mississippi Medical Center (CMMC). Anderson stated that she received an unexpected telephone phone call that Greg Robinson needed to be picked up from CMMC. After an unsuccessful attempt to reach Robinson's sisters, Anderson says she went to CMMC. At CMMC, Anderson was taken to Robinson in the recovery room. Shortly thereafter, Anderson says she heard Horton screaming, asking, with the use of profane language, for the location of her husband. When Horton found Anderson and Robinson together, she called Anderson a derogatory name and even blocked Anderson from leaving the room.

After that incident, says Anderson, she received more than twenty (20) calls at her home and at the VA Hospital from either the building where Horton worked or from Horton's cellular telephone number. Anderson kept a written log of said calls and provided Furr and Smith with a copy.

During one call, the caller identified herself as Brenda Robinson, stated that she was Greg Robinson's wife, and then immediately terminated the call. Anderson said she received another call later that day from a number later identified as Horton's cellular telephone number. The female caller accused Anderson of engaging in sexual

7

relations with Horton's husband. Anderson said she received multiple harassing calls from Horton's cellular telephone number and, as a result, filed a police report on December 3, 2007.

Anderson said Horton continued to call her and harass her by hanging up once Anderson answered and/or by threatening to harm and to kill Anderson. Anderson filed a second police report.

Allan Smith, Manager of the Internal Audit Department for ESI, states that he was notified on January 31, 2008, that a female named Sandra Anderson had reported a complaint to ESI about receiving harassing telephone calls from ESI employee Brenda Robinson. Anderson stated that her caller identification system reflected that she had received multiple calls from an ESI number.

Smith retained counsel, Susan Furr, on behalf of ESI to investigate the allegations. Smith assisted in the investigation.

Smith states that he and Furr interviewed Anderson and a number of employees at the VA Hospital in Jackson, Mississippi, where Anderson was employed. They also reviewed documents, including emails either generated or received by Horton on her Entergy email address, and journals located in her office.

Cornelia Dillon, the patient ombudsman at the VA Hospital, stated that Horton had called the VA Hospital and opined that Anderson was endangering patients. According to Dillon, Horton also recounted having discovered Anderson with her husband at CMMC. Horton said, says Dillon, that she [Horton] believed Anderson was breaking up her marriage and stated that she knew the telephone extension of the VA Hospital program analysts. Dillon provided Smith and Furr with a copy of her [Dillon's]

8

notes of the telephone conversation prepared at the time of the conversation.

Smith and Furr reviewed VA Hospital telephone records which showed that a call was placed to Anderson's extension from Horton's cellular telephone number. The pair reviewed Horton's journals which contained two references to Anderson, including Anderson's work number and a detailed reminder of how to navigate the VA Hospital's phone tree to contact Anderson.

Smith looked through Horton's email account and discovered an excessive number of personal emails, most of which were sent during normal work hours, including emails expressing inappropriate racial opinions, indicating the occurrence of inappropriate conduct, and containing inappropriate jokes that were forwarded to ESI employees and persons outside the office and emails of a sexual nature exchanged between Horton and a man named Joe Cali in Chicago.

Smith and Furr met with Horton at ESI on February 20, 2008, to discuss the investigation. Horton denied calling or threatening Anderson or accusing her of having an affair with Robinson. Horton did admit to calling the VA Hospital to complain about Anderson for creating a safety issue. Horton also admitted to sending inappropriate emails from her work computer. At the end of the interview, Smith directed Horton not to return to work until further notice pending the outcome of the investigation.

Based on the evidence gathered and reviewed, Smith and Furr concluded that: (1) Horton had transmitted inappropriate emails; (2) Horton had not been honest in the investigation; and (3) Horton had, in fact, harassed Anderson. Smith and Furr presented their findings to Jennifer Raeder, ESI's Director, Human Resources Utility, and to Terry Seamons, ESI's Senior Vice President, Human Resources and

Administration. Horton was terminated. Neither Smith nor Furr participated in the ultimate decision to terminate Horton. Smith stated that he was unaware that ESI had ever retained an employee who had engaged in the same or similar misconduct as Horton had committed.

Horton attributes other motives to ESI for her termination. She claims, for example, that in January 2008, Gloria Johnson, Director of Customer Service for ESI, had pulled her aside and . . . :

> she wanted me to know that my name came up. . . she said that the conversation was that if Brenda keeps settling cases like this, she will bankrupt the company. And she said I just want to let you know so that you can be careful. And I said they're probably talking about Steve [Young], and I had nothing to do with that [the settlement of Young's case]. . .

Horton Deposition, p.55.

### D. Termination of Brenda Horton

Horton says Raeder informed her on February 20, 2008, that she was terminated for violation of the ESI email policy. She requested an Issue Resolution Meeting, which was a peer review of an employment action afforded to employees in disciplinary matters. Ultimately, Horton was denied the Issue Resolution Meeting, and the termination stood. ESI filled the position from which Horton was terminated with Katherine Lane, an African American female.

At the time Horton was discharged, her yearly salary was approximately $98,500 plus a bonus. In 2007, Horton was awarded a bonus of $25,000 based on her performance. She also received a bonus in 2006 of about $15,000. Horton also

received a raise effective January 1, 2006.

During her time at Ameritech, and prior to her ultimate termination at Entergy in 2008 (that being a total of twenty-one years in her profession), Horton was never demoted, reprimanded nor disciplined.

### E. The Present Action

On December 23, 2008, Horton filed suit against ESI and Entergy Mississippi, Inc. ("EMI" ) in the Circuit Court of Hinds County, Mississippi, raising three claims: Count I – racial discrimination in violation of Title VII and Title 42 U.S.C. § 1981;[5] Count II - retaliation under Title VII, Title 42 U.S.C. § 2000e *et seq.*; and Count III - intentional infliction of emotional distress. Horton seeks reinstatement or front pay in lieu of reinstatement, back pay, liquidated damages, lost benefits, other pecuniary losses, compensatory damages, punitive damages, costs and fees.

## II. Jurisdiction

Horton's action is based, in part, on the violation of federal statutes. Accordingly, this court has jurisdiction under Title 28 U.S.C. § 1331, which provides that this court has federal question jurisdiction of "all civil actions arising under the Constitution, laws,

---

[5]Title 42 U.S.C. § 1981 states in pertinent part:

(a) Statement of equal rights. All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

or treaties of the United States."

## III. Jurisprudence

### A. Standard

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts demonstrating a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record. . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Rule 56(c)(1). The court is only obligated to consider cited materials but may consider other materials in the record. Rule 56(c)(3). The court must resolve factual controversies in favor of the nonmovant "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37

F.3d 1069, 1075 (5th Cir. 1994). When such contradictory facts exist, the court may

"not make credibility determinations or weigh the evidence." *Reeves v. Sanderson

Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

**B. Entergy Mississippi, Inc. ("EMI")**

Defendants first argue that EMI should be dismissed from this lawsuit because

Horton was not hired, paid or supervised by EMI or an EMI employee. Generally, only

employers may be liable for intentional discrimination under Title VII. *Turner v. Baylor

Richardson Med. Ctr.*, 476 F.3d 337 (5th Cir. 2007). Horton Deposition, pp.15-16. ESI

asserted in its response to Horton's first set of interrogatories:

> EMI has never been Plaintiff's employer. Plaintiff was hired by ESI on
> June 28, 2004. From that date until her termination, Plaintiff's salary was
> paid and her benefits (except for the required employee contributions)
> were funded by ESI. ESI remitted all payroll and other taxes due as a
> result of Plaintiff's employment. Additionally, every member of the Human
> Resources Department, of which Plaintiff was a member, is employed by
> ESI. Plaintiff's supervisors, who were responsible for assigning her work
> and completing her performance evaluations, are ESI employees, and the
> individuals who decided to terminate her employment relationship with ESI
> are ESI employees. Plaintiff's initial offer letter indicated that she was
> being hired by ESI, and ESI provided relocation benefits to Plaintiff upon
> her acceptance of the job offer.

EMI, one of the operating companies for which ESI provides services, has no

employer-employee relationship with Horton. Horton does not dispute this conclusion.

In fact, Horton testified in her deposition that she was not claiming that any employee of

EMI discriminated against her or retaliated against her. Horton Deposition, p.16. The

following exchange occurred during Horton's deposition:

Q. . . . you were employed by Entergy Services, Incorporated?

13

>       A.      Yes.
>
>       Q.      The other defendant in the lawsuit is Entergy Mississippi, Incorporated. Did you ever work for Entergy, Mississippi Incorporated?
>
>       A.      From a payrolling [sic] standpoint, no.
>
>       Q.      Any of your supervisors work for Entergy Mississippi, Incorporated?
>
>       A.      No.
>
>       Q.      Do you claim that any employee or official of Entergy Mississippi, Incorporated discriminated against you or retaliated against you?
>
>       A.      No. Not that I'm aware of –

Horton Deposition, pp.15-16.

This court is persuaded that Entergy Mississippi, Inc., is not an appropriate party to this lawsuit. Horton's claims against Entergy Mississippi, Inc., are dismissed.

## C. Title VII and Title 42 U.S.C. § 1981 Racial Discrimination Claims

The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). In order to establish a prima facie case of racial discrimination, plaintiff must establish that she (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was replaced by someone outside the protected class or other similarly situated employees were treated more favorably. *Bryan v. McKinsey & Co., Inc.*, 375 F.3d 358, 360 (5th Cir. 2004).

This court is not persuaded that Horton can establish the fourth prong required to

make a prima facie case. Horton testified during her deposition that Katherine Lane, a black female, replaced her. Horton Deposition, pp. 94-95. Further, Horton has not put forth sufficient evidence to establish that any similarly situated employee was treated more favorably than she was.

Horton submitted a Disciplinary Chart with her response to ESI's motion for summary judgment, which provides information about thirty-nine "John Does," who were disciplined for "inappropriate use of email" or inappropriate behavior. The chart includes the date of discipline, reason for discipline, and disciplinary action taken. Horton, through an affidavit, attests to the veracity of the data that she was able to access as a human resources manager.

Even if this court concludes that Horton has established a prima facie case, the burden shifts to defendants to articulate a legitimate, non-discriminatory reason for the challenged employment action, *McDonnell Douglas*, 411 U.S. at 802, and defendants have put forth a legitimate, non-discriminatory reason for terminating Horton. ESI, through Smith and Furr conducted an extensive investigation during which ESI discovered that Horton had committed unacceptable misuse of company email and had been dishonest during the investigation. The occurrence and content of the extensive investigation conducted by Smith and Furr has been memorialized by declarations of Smith, Exh. 1 to Motion for Summary Judgment [docket no. 50-1], and Furr, Exh. 3 to Motion for Summary Judgment [docket no. 50-9], which were submitted with the defendants' motion for summary judgment. The findings of that investigation undermined the company's faith in Horton's ability to continue effectively as a Human Resource Manager.

Horton responds that ESI basically chose Anderson's word over her word; however, so long as an employer's belief that an employee engaged in misconduct is "reasonable, not arbitrary, and not likely pretext for unlawful discrimination," that belief constitutes a legitimate non-discriminatory reason for the discharge. *Bauer v. Albemarie Corp.*, 169 F.3d 962, 967 (5th Cir. 1999). This court accepts ESI's reason as legitimate. In order to survive summary judgment, Horton bears the burden to show the articulated reason is pretext, and Horton presents no such evidence.

No genuine dispute as to any material fact exists with respect to Horton's claim of discrimination under Title VII and § 1981; thus, Horton's discrimination claim is dismissed.

**D. Retaliation**

In order to establish a prima facie case of retaliation under either Title VII or § 1981, a plaintiff must show that: (1) she engaged in an activity protected by Title VII; (2) she was subject to an adverse employment action; and (3) a causal connection exists between the participation in the protected activity and the adverse employment action. *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004). Defendants contend that Horton cannot establish that she engaged in a protected activity or that a causal connection exists between her participation in protected activity and the adverse employment action.

Horton has failed to establish a causal connection between her purported protected activity, her finding of discrimination with respect to Young, and her

termination. The following exchange took place during Horton's deposition:

> Q. . . You made a finding in a prior case that someone had actually been discriminated against by Entergy?
>
> A. Yes.
>
> Q. Who was that person?
>
> A. Steve Young.
>
> Q. Okay. And it is your contention in this lawsuit that the reason you got fired is because you found discrimination in that case?
>
> A. Yes.
>
> Q. All right. And what is your basis for saying that's why you got fired?
>
> A. I just know that as a black female I investigated a claim of race discrimination and the process work [sic] through – Steve Young received a settlement in the fall of 2007, and I was discharged February 2008.
>
> Q. Okay. Other than the fact that one of those things happened in 2007 and you got discharged in 2008, why do you believe that your finding in the Young case is the reason you were discharged?
>
> A. I just find that the timing is very close.
>
> Q. Did anybody say anything in connection with the investigation into the complaint made by Sandy Anderson that indicated that your finding in the Young case had anything to do with your getting fired?
>
> A. No.
>
> Q. But you believe the reason you got fired is because you found discrimination in that case?
>
> A. Yes.

Horton Deposition, pp.43-44.

Horton stated that the timing between June 2007, when a settlement was reached between ESI and Young, and her firing in February 2008 constitute a causal

connection.  Horton Deposition, p.44.  The eight month span between her finding that ESI discriminated against Young and her termination is too great to alone establish a causal connection.  *See Rasco v. Potter*, 265 Fed. Appx. 279, 283 (5th Cir. 2008) ("While only four months elapsed between the September 2002 notice of removal and Appellant's prior EEO complaint, this temporal proximity standing alone is not sufficient evidence of causation.").

Horton asserts that what Gloria Johnson told her in January 2008, approximately one month before her termination, about the rumor circulating that Horton would bankrupt the company if she continued to settle cases like Young's also establishes a causal connection.  Horton Deposition, p. 55.  First, this court may not consider hearsay evidence in an affidavit or deposition as summary judgment evidence.  *Snapt Inc. v. Ellipse Communs. Inc.*, 430 Fed. Appx. 346, 352 (5th Cir. 2011) (citing *Martin v. John W. Stone Oil Distrib.*, Inc., 819 F.2d 547, 549 (5th Cir. 1987)).  Secondly, a plaintiff's subjective belief that her employer's actions were based on race is insufficient to create an inference of discriminatory intent.  *Ray v. Tandem Computers*, Inc., 63 F.3d 429, 434 (5th Cir. 1995).  Moreover, during the time between late 2005 when Horton issued her report on Young's claims and Horton's termination in February 2008, Horton was given a raise in January 2006 and awarded substantial discretionary bonuses in 2006 and 2007.  Horton Deposition, pp. 15, 60.

Horton has failed to establish a prima facie case of retaliation.  Her retaliation claim is also dismissed.

**E. Intentional Infliction of Emotional Distress**

Defendants argue that Horton's only pillar for her intentional infliction of emotional distress claim is that ESI fired her. The defendants contend that termination alone fails to establish the type of outrageous conduct required to establish this claim. Horton testified during her deposition:

> A. All right. Do you claim, Ms. Horton, that Entergy intended to cause you to have emotional distress?
>
> A. Yes, through the termination.
>
> Q. Simply based on the fact that they discharged you?
>
> A. I can't speak for what their reasons were, but I did have emotional distress after the termination.

Horton Deposition, p.65.

A claim for intentional infliction of emotional distress will not ordinarily lie for mere employment disputes. *Lee v. Golden Triangle Planning & Dev. Dist., Inc.*, 797 So. 2d 845, 851 (Miss. 2001). The standard for intentional infliction of emotional distress in Mississippi is very high: the defendant's conduct must be "wanton and wilful and [such that] it would evoke outrage or revulsion." *Hatley v. Hilton Hotels Corp.*, 308 F.3d 473, 476 (5th Cir. 2002) (quoting *Leaf River Forest Prods., Inc. v. Ferguson*, 662 So. 2d 648, 659 (Miss. 1995)). The acts must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hatley*, 308 F.3d at 476 (quoting *Speed v. Scott*, 787 So. 2d 626, 630 (Miss. 2001)). The mere fact that a plaintiff was terminated cannot constitute the basis for an intentional infliction of emotional distress claim. *Pipkin v. Piper Impact, Inc.*, 70 Fed. Appx. 760, 765 (5th Cir.

2003). "Losing a job is never pleasant, but it is far from outrageous in character, extreme in degree, and beyond all possible bounds of decency." *Id.*

Horton's claim for intentional infliction of emotional distress is also dismissed. Horton's proof does not possess the muscle to support this cause of action.

### IV. Holding

Since the plaintiff has failed to establish that a genuine dispute as to any material fact exists regarding any of her claims, this court must grant the defendants' motion for summary judgment [docket no. 50] and to dismiss this case with prejudice. The defendants' motion in limine [64], therefore, is moot.

SO ORDERED, this the 31st day of March, 2012.

s/ HENRY T. WINGATE
UNITED STATES DISTRICT JUDGE


Civil Action No. 3:09-cv-66 HTW-LRA
Order Granting Motion for Summary Judgment
Order Terminating Motion in Limine as Moot